1

2

3                                             O

4

5

6

7

8                 UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11  KATHLEEN OPLIGER,          )    Case No. EDCV 07-993-VAP
                               )    (OPx)
12              Plaintiff,     )
                               )    **[Motion filed on January 16,**
13       v.                    )    **2009 ]**
                               )
14  MIKE JOHANNS, Secretary,   )    **ORDER DENYING MOTION FOR**
    U.S. Department of         )    **SUMMARY JUDGMENT**
15  Agriculture,               )
                               )
16              Defendants.    )
    _____)
17

18       Defendant's Motion for Summary Judgment ("Motion")

    came before the Court for hearing on March 9, 2009.
19
    After reviewing and considering all papers filed in
20
    support of, and in opposition to, the Motion, as well as
21
    the arguments advanced by counsel at the hearing, the
22
    Court DENIES the Motion.
23

24
                        **I. BACKGROUND**
25
    **A.   Procedural History**
26
         On August 8, 2007, Plaintiff Kathleen Opliger
27
    ("Plaintiff") filed this action, naming Mike Johanns as
28
    Secretary of the U.S. Department of Agriculture

("Defendant") as Defendant.  She states three claims: (1) discrimination on account of sex in violation of Title VII; (2) retaliation in violation of Title VII; (3) wrongful termination.

On January 16, 2009, Defendant filed its Motion for Summary Judgment ("Motion").  Plaintiff filed Opposition and Defendant filed its Reply.

**B.   Evidentiary Objections**

Defendant objects to portions of several paragraphs of Plaintiff's declaration (Declaration of Plaintiff ("Pl. Decl")).  The Court sustains the objections to the quoted excerpts from the following paragraphs: 7, 12, 16, 17, 20 (only insofar as Plaintiff reports the remarks of Feser); 21 (to the extent Plaintiff describes her job duties as not those of a firefighter and her description of Dietrich's instructions).  The Court also sustains Defendant's objections to paragraph 23 of Plaintiff's declaration and Exhibit 3 attached thereto on the basis of lack of foundation.

The Court overrules objections to the following paragraphs of Plaintiff's declaration: 18 (text quoted in objection does not appear at paragraph 18 of declaration); 21 (only to the extent Plaintiff describes placement of her desk), 25.

In her Statement of Genuine Issues ("SGI"), Plaintiff objects to several of Defendant's asserted undisputed facts, which she lists according to the numbers next to which they appear in Defendant's Statement of Undisputed Facts ("DSUF").  The Court sustains Plaintiff's objections to the following items in the DSUF: 9, 43, 44, 45, 46, 47, 51, 52 and 53.

The Court overrules Plaintiff's objections to the following items in the DSUF: 11, 14, 17, 18, 21, 22, 23, 24, 26, 27, 33, 34, 35, 36, 39, 41, 42, 48, 49, 50 (to the extent Dietrich reports his own actions), 54, 55, 56 and 57.

The Court overrules all objections not listed here as moot.

**B.   Facts**

In 1989, Plaintiff began work at the National Forest Service in the San Bernardino National Forest and eventually rose to the rank of Engine Captain.  (DSUF 1.) Approximately a decade later, in 1999 or 2000, Plaintiff's husband, Rocky Opliger ("R. Opliger") "detailed into" or performed a temporary work assignment, as a Deputy Forest Fire Management Officer in San Bernardino National Forest.  In 2000, Defendant hired R.

1   Opliger for this position on a permanent basis.  (DSUF

2   5.)[1]

3

4       At the time, Fire Management Officer Michael Dietrich

5   ("Dietrich") contacted regional authorities about

6   nepotism concerns and issued R. Opliger a letter ("the

7   limitations letter") requiring him to remove himself from

8   his wife's chain of command in certain circumstances and

9   refer matters involving Plaintiff to Dietrich.  (DSUF 4-

10  6.)  Plaintiff did not receive a copy of the limitations

11  letter.  (Pl. Decl. ¶ 4; DSUF 6, 8.)

12

13      During the same year Defendant hired R. Opliger,

14  Defendant promoted Betty Ashe to Battalion Chief.

15  (Plaintiff's Statement of Genuine Issues ("SGI") 117; Ex.

16  14.)  Ashe was to remain the only woman of the Battalion

17  Chief rank until 2005.  (DSUF 46; Deposition of Kathleen

18  Opliger ("Pl. Dep.") 188, Declaration of Joseph Howell

19  ("Howell Decl.") Ex. 3; Deposition of Rocky Opliger ("R.

20  Opliger Dep.") 55, Howell Decl. Ex. 2.)

21

22  **1.   2002 Battalion Chief position**

23      From fall through winter of 2000-01, Defendant

24  permitted Plaintiff to detail into a Battalion Chief

25

26  _____

27      [1]According to R. Opliger, the four relevant levels of
    the Forest Service hierarchy are, from lowest to highest,
    captain, battalion, division, and deputy forest
28  management officer.  (R. Opliger Dep. 29.)

4

Training Coordinator position for 3 months.  The next year, in the late summer to winter of 2001-02, Plaintiff detailed into a "Battalion Chief Suppression" position for 120 days.  (Pl. Decl. ¶ 5.)

In May 2002, after Plaintiff had completed her second detail in a Battalion Chief position, Defendant advertised an opening for a permanent Battalion Chief Suppression Officer position for Battalion 31 and Plaintiff applied.  (Pl. Decl. ¶¶ 5-6; Deposition of Michael Dietrich ("Dietrich Dep.") 125:8-13, Howell Decl. Ex. 5.)

In July 2002, Defendant rejected Plaintiff for the Battalion Chief position, citing nepotism concerns in a letter issued by Forest Supervisor Gene Zimmerman ("Zimmerman").  Defendant removed Plaintiff from the list of eligible candidates; as a result, she was passed over for another Battalion Chief position as well, when Defendant used the list compiled for the 2002 position to fill a vacancy in June 2003.  (Pl. Decl. ¶ 11.)

Also in July 2002, Division Chief Mitch McCormick ("McCormick"), whom a fellow employee testified referred to women by derogatory names and resented their presence in the workplace, had recommended Darryl Mincey ("Mincey") for the 2002 position.  (Deposition of Steve

1 Kilgore ("Kilgore Dep.") 17-21, Howell Decl. Ex. 7.)
2 Mincey already held a Battalion Chief position.  Dietrich
3 acted on McCormick's recommendation and suggested Mincey
4 to Zimmerman; Mincey, a white male, obtained the 2002
5 position.  (Pl. Decl. ¶ 8; Kilgore Dep. 17-21.)

7      According to Plaintiff, she was angry Mincey received
8 the 2002 position but she did not complain because she
9 feared being "blackballed."  (Pl. Dep. 134.)

11     **2.   2003 Battalion Chief position**
12     After Defendant rejected her for the 2002 Battalion
13 Chief position, Plaintiff once again detailed into a
14 Battalion Chief position, this time a Battalion Chief
15 Training Coordinator position, beginning in the fall of
16 2002 and ending in February 2003.  (Pl. Decl. ¶ 9.)

18      In the spring of 2003, R. Opliger received a
19 complaint that Mincey had made a threat of violence
20 against Plaintiff.  Some of Plaintiff's staff also
21 complained that McCormick and Mincey were treating them
22 badly because their supervisor was a woman.  R. Opliger
23 told Dietrich about these complaints.  (R. Opliger Dep.
24 44-51.)  According to R. Opliger, he received the
25 complaints in March 2003; Dietrich testified he received
26 them in mid-to-late June 2003.  (R. Opliger Dep. 45-51;
27 Dietrich Dep. 57.)

28

1    In May 2003, Defendant again advertised for a
2 Battalion Chief position, this time the Battalion Chief
3 Training Officer ("2003 position") for which Plaintiff
4 applied.  (Pl. Decl. ¶ 10.)[2]

5

6    After Defendant advertised the 2003 position, three
7 chains of events simultaneously occurred during the
8 summer and fall of 2003.  First, Defendant rejected
9 Plaintiff from the 2003 position citing nepotism concerns
10 and filled the vacancy with a male applicant.  (Zimmerman
11 Dep. Ex. 12; SGI ¶ 86; Pl. Decl. ¶ 15.)

12

13    Second, by the summer of 2003 Dietrich had received
14 several complaints that R. Opliger was favoring
15 Plaintiff, that Plaintiff appeared to be working excess
16 overtime, that she may have played an improper role in
17 hiring her niece, and that R. Opliger and Plaintiff had a
18 conversation on July 3, 2003 about a third person
19 receiving a training assignment that may have run afoul
20 of the limitations letter.  (DSUF 10-12.)  By July 5,
21 2003, Dietrich had begun a fact-finding inquiry into
22 Plaintiff's conduct and by August 2003 the regional

23

24 _____

[2]According to Plaintiff, the 2003 position was not
25 within R. Opliger's chain of command.  (Declaration of
Gene Zimmerman ("Zimmerman Dep.") 42-46, 111-14, Howell
26 Decl. Ex. 4.)  Zimmerman states that "in the organization
chart" this position "reported directly to Dietrich" but
27 that in practice it would have required R. Opliger to
approve Plaintiff's pay and that he would have influenced
28 her assignments.  (Zimmerman Dep. 42-46, 113.)

office authorized a formal investigation.  The
investigation would continue until a few days before
Plaintiff resigned, culminating in a finding Plaintiff
participated inappropriately in the hiring of her niece.
(DSUF 16-18, 56.)

The third series of events during the latter half of
2003 began when Plaintiff filed an EEO complaint about
her rejection from the 2003 position, Defendant
temporarily relieved R. Opliger of his supervisory
duties, and the parties entered into negotiations,
reaching a tentative settlement agreement.  (Pl. Decl. ¶¶
13-14, 18; Declaration of Michael Dietrich ("Dietrich
Decl.") ¶ 7.)

### 3.  February 2004 through March 2005 details

Some time between December 2003 and February 2004,
the regional office disapproved the tentative settlement
and placed Plaintiff into a series of temporary details.
(Pl. Decl. ¶ 19; DSUF 27-29.)  According to Defendant,
"many if not most of" these assignments "had no fire-
suppression duties."  (DSUF 29.)  Plaintiff would remain
in the details from February 2004 until she left in March
2005.  (DSUF 25, 54.)

## 4.  Nepotism policy

The Forest Service Handbook, at 6109.41, section 21.12 states:

> Forest Service employees may not supervise a relative either directly or indirectly.  Direct supervision includes assigning responsibilities, granting leave, evaluating performance, approving training, evaluating for promotion, and taking or recommending adverse action. Indirect supervision involves sharing supervisory activities with the immediate supervisor of an employee by participating in a substantive way in making work assignments, monitoring performance, and promotion evaluation of the employee.  Any instance of direct or indirect supervision of an employee by a relative shall be eliminated at the first reasonable opportunity.

Howell Decl. Ex. 11.

The Code of Federal Regulations permits violation of the nepotism policy in emergencies, although it does provide examples of emergencies.  5 C.F.R. 310.102.[3]

---

[3]The regulations provide:
Subsection (d) of 5 U.S.C. 3110 authorizes the Office of Personnel Management to prescribe regulations authorizing the temporary employment of relatives, in certain conditions, notwithstanding the restrictions. This regulation sets forth exceptions to the restrictions. When necessary to meet urgent needs resulting from an emergency posing an immediate threat to life or property, or a national emergency as defined in § 230.402(a)(1) of this title, a public official may employ relatives to meet those needs without regard to the restrictions on the employment of relatives in 5 U.S.C. 3110. Such appointments are temporary and may not
(continued...)

9

## II. LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." <u>Anderson</u>, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. <u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998); <u>Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.</u>, 707 F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Where the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the

---

[3](...continued)
exceed 30 days, but the agency may extend such an appointment for one additional 30-day period if the emergency need still exists at the time of the extension.
5 C.F.R. 310.102.

1  non-moving party's case.  <u>Celotex</u>, 477 U.S. at 325.

2  Instead, the moving party's burden is met by pointing out

3  that there is an absence of evidence supporting the non-

4  moving party's case.  <u>Id.</u>

5

6      The burden then shifts to the non-moving party to

7  show that there is a genuine issue of material fact that

8  must be resolved at trial.  Fed. R. Civ. P. 56(e);

9  <u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256.  The

10  non-moving party must make an affirmative showing on all

11  matters placed in issue by the motion as to which it has

12  the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322;

13  <u>Anderson</u>, 477 U.S. at 252.  <u>See also</u> William W.

14  Schwarzer, A. Wallace Tashima & James M. Wagstaffe,

15  <u>Federal Civil Procedure Before Trial</u> § 14:144.

16

17      A genuine issue of material fact will exist "if the

18  evidence is such that a reasonable jury could return a

19  verdict for the non-moving party." <u>Anderson</u>, 477 U.S. at

20  248.  In ruling on a motion for summary judgment, the

21  Court construes the evidence in the light most favorable

22  to the non-moving party.  <u>Barlow v. Ground</u>, 943 F.2d

23  1132, 1135 (9th Cir. 1991); <u>T.W. Electrical Serv. Inc. v.</u>

24  <u>Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31

25  (9th Cir. 1987).

26

27

28

### III. DISCUSSION

Defendant moves the Court for summary judgment on all three of Plaintiff's claims, alleging sex discrimination, retaliation, and wrongful discharge.  As Plaintiff alleges the retaliation occurred because she complained of sex discrimination, the Court discusses the first two claims together.

## A.   Discrimination on Account of Sex and Retaliation

### 1.   Timeliness of EEO complaint

Defendant argues that to the extent Plaintiff bases her action on the events surrounding the 2002 position, it is time-barred.  Plaintiff asserts her complaint about the 2003 position was timely and that moreover both incidents were part of a "pattern of discriminatory conduct."  (Opp'n 13.)  Pursuant to Lyons v. England, 307 F.3d 1092, 1111 (9th Cir. 2002), the Court finds the 2002 incident time-barred but "relevant as background" which "may be considered . . . in assessing the defendant's liability" for discrimination as to the 2003 position. See id.

### 2.   The parties' burdens

A plaintiff makes a prima facie case of failure to promote on the basis of sex when she shows: (1) she is a member of a protected class; (2) she applied for and was qualified for an open job; (3) she was rejected for that

job; (4) after her rejection, the position remained open and the employer continued to seek persons with plaintiff's qualifications.  <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802 (1973).

To make out a prima facie case of retaliation, a plaintiff must demonstrate (1) she engaged in protected activity; (2) defendant subjected her to an adverse employment decision; (3) the activity and the decision were causally linked.  <u>Bergene v. Salt River Project Agricultural Improvement and Power District</u>, 272 F.3d 1136, 1141 (9th Cir. 2001).  An adverse employment action is one which "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington Northern and Santa Fe Railway Co. v. White</u>, 548 U.S. 53, 68-69 (2006) (internal citations omitted).

Once a plaintiff establishes a prima facie case, the burden shifts and the defendant must "provide a legitimate, non-discriminatory reason for the employment action."  <u>Vasquez v. County of Los Angeles</u>, 349 F.3d 634, 641 (9th Cir. 2004); <u>Bergene</u>, 272 F.3d at 1140-41 (burdens for discrimination and retaliation).  The defendant need offer only reasons that, "*taken as true*, would *permit* the conclusion that there was a non-

discriminatory reason for the adverse action."  St.
Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)
(emphasis in original).  If defendant has carried its
burden of production, "the McDonnell-Douglas framework–
with its presumptions and burdens– is no longer
relevant."  Id. at 510.  "[T]he defendant need not
persuade the court that it was actually motivated by the
proffered reasons".  Id.

The burden returns to the plaintiff to show that this
articulated reason was "pretextual."  Vasquez, 349 F.3d
at 641.  "A plaintiff can show pretext directly, by
showing that discrimination more likely motivated the
employer, or indirectly, by showing that the employer's
explanation is unworthy of credence."  Id.  "To show
pretext using circumstantial evidence, a plaintiff must
put forward specific and substantial evidence challenging
the credibility of the employer's motives."  Id.;
Bergene, 272 F.3d at 1142.

Pursuant to McGinest v. GTE Service Corp., 360 F.3d
1103, 1124 (9th Cir. 2004), "very little evidence is
necessary to raise a genuine issue of fact regarding an
employer's motive; any indication of discriminatory
motive. . . may suffice to raise a question that can only
be resolved by a fact-finder."  (ellipses in original).
When the question can only be resolved through a

1  "searching inquiry" summary judgment is not appropriate.
2  Id.

3
4  **3.  Plaintiff's prima facie case**
5      Plaintiff has made out a prima facie case of both sex
6  discrimination and retaliation.  As to sex
7  discrimination, she has proffered evidence she: (1) is a
8  member of a protected class, females; (2) applied for and
9  was qualified for an open job, i.e., the 2003 position.
10 (Pl. Decl. ¶ 10.)  She also demonstrates Defendant (3)
11 rejected her for that job although it (4) kept the
12 position open and hired a man into it.  (Pl. Decl. ¶ 15;
13 Opp'n 13.)

14

15     Plaintiff also bears her initial burden as to the
16 retaliation claim.  She shows she (1) engaged in the
17 protected activity of filing an EEO complaint; and (2)
18 suffered an adverse employment action, assignment into a
19 series of details, "many if not most of" which "had no
20 fire-suppression duties," which Plaintiff proffers
21 evidence were prestigious; she presents evidence the
22 details put her fire-suppression credentials at risk.
23 (DSUF 29; Pl. Decl. ¶¶ 20, 22.)  She also proffers
24 evidence of (3) a causal connection by demonstrating
25 temporal proximity.  See Passantino v. Johnson & Johnson
26 Consumer Products, Inc., 212 F.3d 493, 507 (9th Cir.
27 2000).

28

1        **4.   Defendant's legitimate, non-discriminatory**
2             **reason**

3        Defendant meets its burden by "provid[ing] a
4   legitimate, non-discriminatory reason for the employment
5   action": it rejected Plaintiff from the 2003 position and
6   placed her on the details between February, 2004 and
7   March, 2005 to comply with its nepotism policy.  See
8   Vasquez, 349 F.3d at 641; (Mot. 12-13.)

9

10       Several of Defendant's decisions vis-à-vis Plaintiff
11  required Defendant to interpret the nepotism policy.
12  First, when Defendant offered R. Opliger permanent
13  employment in 2000, Defendant's staff learned R. Opliger
14  and Plaintiff were married, and there could be an issue
15  with the nepotism policy.  (Dietrich Decl. ¶ 3.)  At the
16  time, Defendant adopted the position that the limitations
17  letter was sufficient.  (See Dietrich Decl. ¶ 3.)

18

19       By the summer of 2003, however, Defendant did not
20  find the limitations letter sufficient.  First, on July
21  3, 2003, R. Opliger and Plaintiff had a conversation
22  about a third person's training assignment; Defendant
23  believed this violated the supervisory limitations
24  letter. (DSUF 10.)  Also, Dietrich was concerned R.
25  Opliger had approved improper overtime for Plaintiff,
26  Dietrich had begun to receive complaints R. Opliger

27

28

                              16

favored Plaintiff, and he became concerned about her role in her niece's hiring.  (DSUF 13; Dietrich Decl. ¶¶ 4-5.)

Furthermore, according to Defendant, Plaintiff's application for the 2003 position raised nepotism concerns because R. Opliger was the point of contact for recruitment and the position would have required Plaintiff to report to her husband for some functions. (DSUF 36; Zimmerman Dep. 43, 113-114; Dietrich Decl. ¶ 9.)

Finally, Defendant claims it could not permit Plaintiff to continue work as an Engine Captain and accordingly placed her on various details beginning in February 2004 to avoid further nepotism concerns.  (DSUF 25; Declaration of Vicki Jackson ("Jackson Decl.") ¶¶ 5-6.)  Defendant produces the declaration of Vicki Jackson ("Jackson"), who served as Acting Associate Regional Forester, and then as Associate Regional Forester; according to Jackson, "[t]he regional office was not aware there was a nepotism risk" before approximately December 2003; once the regional office learned of it, Jackson "concluded [she] had no choice but to remove" Plaintiff from R. Opliger's chain of command.  (Jackson Decl. ¶ 5.)

**5.   Plaintiff's evidence of pretext**

To create a triable issue of fact as to her discrimination or retaliation claim, Plaintiff must adduce sufficient direct and circumstantial evidence. See Bergene, 272 F.3d at 1141-43.  Direct evidence, if believed, demonstrates discriminatory animus "without inference or presumption."  Id. at 1141 citing Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998). Circumstantial evidence "must be specific and substantial in order to survive summary judgment."  Id. at 1142. Circumstantial evidence may raise a triable issue of fact as to pretext "indirectly, by showing that the employer's explanation is unworthy of credence."  Vasquez, 349 F.3d at 641.

**i.   Discrimination on the basis of sex**

Plaintiff produces circumstantial evidence that at least one manager at Defendant organization, McCormick, who played a role in her rejection from the 2002 position, harbored animus against women and that Mincey, the male applicant who received the position for which she was rejected, later threatened her.  Plaintiff proffers proof that McCormick, who recommended Mincey for the 2002 position, repeatedly called women a vulgar name and objected to their presence in the workplace.

(Kilgore Dep. 17-21.)[4]  She also adduces evidence
McConnell and Mincey influenced the conditions of her
employment into 2003, i.e., her husband's deposition
testimony regarding the complaint he received in March
2003 from Steve Hynes that Mincey threatened Plaintiff.[5]
(SGI 88; Opp'n 9-10 citing R. Opliger Dep. 44-45, 48-51.)
R. Opliger also received complaints in 2003 from those
Plaintiff supervised that McCormick and Mincey were
passing them over for training opportunities because
Plaintiff was female.  (SGI 88; Opp'n 9-10; R. Opliger
Dep. 44-51.)

     In addition, Plaintiff presents evidence there was
only one woman, Betty Ashe ("Ashe") at the Battalion
Chief rank when Plaintiff applied for the 2003 position.
Plaintiff submits Ashe's affidavit she believes
Plaintiff's supervisors favored men over women[6] and that
although she "never heard Mincey or McCormick say
anything. . . women on that District never went very far.
They did not provide a place where women could succeed."

---

     [4]As Plaintiff did not timely complain of the 2002
decision, McCormick's recommendation of Mincey in 2002
is relevant only as background information.  See Lyons,
307 F.3d at 1111; cf. Bergene, 272 F.3d at 1141
(manager's improper motive may be imputed to company if
manager involved in decision).

     [5]Defendant did not object to R. Opliger's deposition
testimony as hearsay.

     [6]Defendant did not raise an objection to this
evidence.

(Affidavit of Betty Ashe ("Ashe Aff.") 2, Howell Decl. Ex. 14.)   The evidence from Ashe is similar to, but less extreme than, the evidence the plaintiff produced in <u>Bergene</u>, 272 F.3d at 1143, where the Ninth Circuit found the absence of women in supervisory positions was circumstantial evidence of discrimination in a failure-to-promote action.[7]

Taken together, Plaintiff's evidence suggests discriminatory animus, rather than nepotism concerns, may have motivated those who made the decision in 2003 to reject Plaintiff.   <u>See Vasquez</u>, 349 F.3d at 641.

In addition, Plaintiff argues the nepotism policy is a pretext for sex discrimination because "there were many instances where [the] nepotism [policy] was not followed by the agency."  (Opp'n 15, 21-22.)   The only evidence before the Court[8] from Plaintiff on this issue is the affidavit of Randall Clauson ("Clauson Aff."), Division Chief of the Mountain Top Ranger District, who worked

---

[7]Defendant asserts two women were promoted to Battalion Chief, Mary Bogens and Renee McCormick, but these promotions are irrelevant to Plaintiff's claim because they took place in 2005, after Plaintiff had been denied the 2003 position.  (Reply 1:9-17; DSUF 46; Pl. Dep. 188:11-25; R. Opliger Dep. 55.)

[8]The Court sustained Defendant's objection to two of Plaintiff's pieces of evidence regarding Defendant's treatment of others with relatives in the Forest Service, paragraph 23 of Plaintiff's declaration and Exhibit 3 attached thereto.

with Plaintiff, although it is not clear in what
capacity.  (Clauson Aff., Howell Decl. Ex. 17.)  He
states, "[t]here were other incidents of family members
working together, and there were never any repercussions
. . . [d]uring the time of her complaint, and subsequent
removal from her position, there was a father/son duo
working on the same crew, on the same District as
[Plaintiff].  Frank Esposito was a captain, and his son
was on his crew.  The Esposito case never became an
issue."  (Clauson Aff.)

Construing these facts in favor of the non-moving
party, i.e., that the father supervised the son, this
evidence alone is not substantial enough to suggest a
discriminatory pattern of behavior by Defendant.  <u>See</u>
<u>Vasquez</u>, 349 F.3d at 641.

Plaintiff also proffers Jackson's deposition
testimony that Defendant sometimes altered the chain of
command to accommodate nepotism concerns.  (Opp'n 18.)
This is insufficient to meet Plaintiff's burden because
Defendant appears to have altered the chain of command in
her case as well, by issuing the limitations letter.

Finally, Plaintiff argues to no avail that Defendant
applied its nepotism policy inconsistently to her husband
and herself: (1) Defendant offered her husband permanent

employment but denied her similar treatment years later;
and (2) Defendant would permit temporary assignments but
blocked Plaintiff from the 2003 position.  (Opp'n 15, 18,
20-21.)  Plaintiff's own evidence, however, provides
reasons for Defendant's actions.  For example, the
details were permissible because they occurred during the
winter, when fires, and therefore reporting to her
husband, were least likely.  (See Zimmerman Dep. 45.)
Without demonstrating that others received better
treatment, the Court cannot find evidence of
discrimination in these acts.

     Nevertheless, Plaintiff has raised a triable issue of
fact as to discrimination.  She presents evidence that:
     •at least one manager was vocal about his resentment
      of women in his workplace;
     •the same manager recommended a male applicant into a
      position for which Plaintiff had applied;
     •that applicant later made a threat against Plaintiff
      using a gender-specific slur; and
     •only one woman had achieved the rank she sought.
This is similar to the evidence produced by the plaintiff
in Bergene, who worked at the Salt River Project Coronado
Generating Station as an electrician.  Bergene, 272 F.3d
at 1139-40.  She successfully resisted summary judgment
regarding her failure to promote claim by demonstrating
(1) a position announcement was altered in a way that

1  disfavored someone with her qualifications; (2) that she
2  was "referred to as 'Mommy' in the workplace," which
3  showed "she was singled out on the basis of her sex," and
4  (3) that there were no women supervisors at her work
5  location during her tenure.  Id. at 1143.  Accordingly,
6  the Court finds Plaintiff has raised a triable issue of
7  fact and the Court DENIES the Motion as to Plaintiff's
8  discrimination claim.

9

10              **ii. Retaliation for EEO activity**[9]

11      The parties agree Defendant assigned Plaintiff to
12  details from February 2004 through March 2005 after
13  Defendant refused to consummate the settlement agreement.
14  Plaintiff claims the detail assignments were retaliatory;
15  Defendant, on the other hand, contends they were a
16  necessary temporary solution while Defendant found a
17  permanent resolution.  In other words, Defendant provides
18  its nepotism policy as the legitimate, non-
19  discriminatory reason it placed Plaintiff on the details.
20  (Jackson Decl. ¶ 5.)

21

22

23  ────────────

24      [9] Defendant moves the Court for summary judgment on
    Plaintiff's "harassment" claim and moves the Court to
25  dismiss her "hostile work environment" claim.  (Mot. 13;
    Reply 9.)  Review of the Complaint shows Plaintiff does
26  not bring suit for sexual harassment, or any other kind
    of hostile work environment, but instead for retaliation,
27  including harassment, for filing her EEO claims.  (Compl.
    ¶ 9.)  Accordingly, the Court addresses harassment in the
28  context of Plaintiff's retaliation claim.

1    To rebut Defendant's account, Plaintiff first attacks
2 Defendant's evidence regarding its reason for acting in
3 2004, rather than earlier, to remove her from her
4 husband's chain of command.  According to Jackson's
5 declaration, the regional office placed Plaintiff on the
6 details as soon as it learned of the nepotism concerns;
7 the regional office did not know of the nepotism concerns
8 until at least December 2003.  (Jackson Decl. ¶ 5.)
9 Plaintiff adduces evidence that Zimmerman consulted with
10 regional office staff about the nepotism issue as early
11 as 2000 and that he communicated with the regional office
12 again about this issue in 2002.  (Zimmerman Dep. 25;
13 Howell Decl. Ex. 9; Affidavit of Gene Zimmerman
14 ("Zimmerman Aff."), attached as Ex. 5 to Zimmerman Dep.,
15 at page marked Bates stamp 110.)  By producing evidence
16 suggesting stated Defendant's reason for acting is false,
17 Plaintiff has met her burden on summary judgment of
18 showing Defendant's reason was a pretext for retaliation.
19 See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.
20 133, 144 (2000).

21

22    Plaintiff also provides circumstantial evidence the
23 details were unfavorable assignments and that Defendant's
24 plan was eventually to move Plaintiff or her husband "out
25 of fire or off the Forest."  (Zimmerman Aff., attached as
26 Ex. 5 to Zimmerman Dep., at page marked Bates stamp 110.)

27

28

One of her first details was serving as assistant to the Lands and Resource Officer, accepting special use applications and processing them. (Pl. Dep. Ex. 539.) This was apparently not a fire-fighting assignment; in fact, the parties agree "many if not most of" these details "had no fire-suppression duties," and according to Plaintiff, fire-suppression duties are prestigious. (DSUF 29; Pl. Decl. ¶¶ 19, 22.) Plaintiff presents evidence the details were "not related to [her] job as an engine captain," "would not allow [her] to retain [her] firefighter qualifications," and placed her firefighter retirement benefits at risk. (Pl. Decl. ¶¶ 20, 21; Pl. Dep. 252, 254.) At least one of the details did not have a job description, which made it difficult for her to succeed and compromised her ability to gain promotions. (Pl. Dep. 254.) She became subject to "continual cautionary letters" and "letters of reprimand." (Pl. Dep. 254.) Plaintiff also complains she was excluded from one lunch and from the use of a government vehicle. (Pl. Decl. ¶ 25.)[10] Her last detail, at which she worked for at least three months, was at the Southern Geographic Coordination Center, where she "essentially had no actual

---

[10]Although it would have been helpful if Plaintiff had provided more evidence about the meaning of doing fire-suppression work and the credentialing system for firefighters, the Court understands the threat to one's occupational credentials as a serious consequence. The Court notes Plaintiff's evidence also shows she obtained an assignment which permitted her to retain those credentials. (Pl. Decl. ¶ 20.)

responsibilities" and her desk was in a dark, windowless hallway to the restroom.  (Pl. Decl. ¶¶ 20, 21; Pl. Dep. 252, 254-55.)  She was not aware the details were a temporary measure and felt there was "no relief in sight."  (Pl. Dep. 254.)

A rational finder of fact could infer from this evidence that the details were materially worse assignments than Plaintiff's permanent Engine Captain position or her earlier Battalion Chief details. Although Plaintiff does not show that the details were more arduous and dirtier than her previous employment, as did the plaintiff in Burlington, who was reassigned from fork lift operator to "track laborer," she does produce some evidence the details were dead-end assignments in which she was given little to do and was at risk of losing her professional credentials.  See Burlington, 548 U.S. at 71; (Pl. Decl. ¶¶ 19, 20, 21, 25).

Plaintiff's situation is also similar to that of the plaintiff in Satterwhite v. Smith, 744 F.2d 1380, 1383 (9th Cir. 1984) (upholding judgment reached after trial in favor of plaintiff for constructive discharge). Satterwhite, an African-American man who worked for six months in a temporary sweeper position at a port, demonstrated constructive discharge through "very poor working conditions" by showing that he was not

interviewed for permanent positions although white men
were, that the defendant's stated reason for not
interviewing him was pretextual, and "his supervisor
relegated him to working a disproportionate share of time
in the rope room, where he was assigned the dull task of
tying ropes." Id. at 1383.  Through these facts,
Satterwhite showed he had "virtually no opportunities for
career advancement." Id.  Although Satterwhite involved
constructive discharge rather than retaliation, it
remains instructive.  Constructive discharge requires not
only a finding of discrimination but also "aggravating
factors, such as a continuous pattern of discriminatory
treatment." See Wallace v. City of San Diego, 479 F.3d
616, 625-26 (9th Cir. 2007).  Accordingly, the standard
for constructive discharge is more demanding than that
for retaliation.  The Court concludes that Plaintiff has
offered evidence she was relegated to tasks in which she
did not have opportunities for career advancement and
which were otherwise undesirable.

        Plaintiff also directs the Court to statements by
Defendant which, viewed in the light most favorable to
the non-moving party, suggest Defendant designed the
details as part of a plan to prompt Plaintiff or her
husband eventually to resign.  According to Zimmerman's
affidavit, "the plan after Ms. Opliger's detail was to
move one of the Opligers out of fire or off the Forest."

1   (Zimmerman Aff., attached as Ex. 5 to Zimmerman Dep., at

2   page marked Bates stamp 110, all located at Ex. 4 to

3   Howell Decl.)   Plaintiff does not explain what "out of

4   fire or off the Forest" means.   Nevertheless several of

5   Defendant's statements in its moving papers shed light on

6   Defendant's plan.   In Defendant's Reply, it portrays the

7   details as "an opportunity – over a period of months –

8   [for Plaintiff and her spouse] to demonstrate some

9   initiative and find for themselves a permanent,

10  reasonable solution.   They ultimately decided he would

11  stay in San Bernardino and she would move on to another

12  job."   (Reply 5.)   Defendant's Reply also states "either

13  she or her husband had to go" because of nepotism

14  concerns.   (Reply 9.)   Defendant's conviction that one of

15  the Opligers "had to go" and that the details were an

16  "opportunity" for one of them to find another job

17  suggests the details may have been less than the rosy

18  opportunities the defense claims.

19

20       In sum, Plaintiff has raised a triable issue of fact

21  as to her retaliation claim.   Plaintiff contradicts

22  Defendant's non-discriminatory reason for beginning the

23  details in February 2004 and provides circumstantial

24  evidence they were materially less desirable assignments

25  than her previous details.   This evidence, combined with

26  Defendant's admitted "plan" "to move one of the Opligers

27  out of fire or off the Forest" raises a triable issue of

28

1  fact as to whether these details were retaliation against
2  Plaintiff for filing an EEO complaint.

3

4  **B.  Wrongful Discharge**

5      Plaintiff's employment with Defendant ended in March
6  2005.  She asserts Defendant wrongfully and
7  constructively discharged her in violation of public
8  policy because it imposed unfavorable work assignments on
9  her as a consequence of her EEOC complaint.  Defendant
10 moves for summary judgment on Plaintiff's claim of
11 wrongful discharge arguing (1) it did not discriminate
12 against Plaintiff; (2) it did not constructively
13 discharge her.  (Mot. 14-15.)  As the Court rejects the
14 first argument above, it proceeds to the second.

15

16     According to Wallace, 479 F.3d at 625-26,
17 constructive discharge occurs when, "looking at the
18 totality of the circumstances, 'a reasonable person in
19 [the employee's] position would have felt that he was
20 forced to quit because of intolerable and discriminatory
21 working conditions.'"  Id. citing Watson v. Nationwide
22 Ins. Co., 823 F.2d 360, 361 (9th Cir. 1987) (alteration
23 in the original).  According to the Ninth Circuit,
24 constructive discharge occurs when "the individual has
25 simply had enough; she can't take it anymore."  Id. at
26 626, citing Draper v. Coeur Rochester, Inc., 147 F.3d
27 1104, 1110 (9th Cir. 1998).  Indeed, "[w]hether working
28

conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury." Id. citing Schnidrig v. Columbia Mach., Inc., 80 F.3d 1406, 1411 (9th Cir. 1996).  A prevailing plaintiff "must show some aggravating factors, such as a continuous pattern of discriminatory treatment." Id.

Some of the behavior about which Plaintiff complains clearly does not rise above "simple teasing, offhand comments, and isolated incidents" which Faragher and Burlington establish as non-actionable. See Faragher, 524 U.S. 775, 788 (1998); Burlington, 548 U.S. at 69; (Mot. 15.)  For example, Plaintiff complains of exclusion from a single lunch run and that co-workers insinuated she was having an affair.  See Burlington, 548 U.S. at 69 (exclusion from lunch usually not actionable).  She does not tie the comments about the affair to anyone in management and accordingly these remarks cannot be held against Defendant.  See Bergene, 272 F.3d at 1141.

On the other hand, Plaintiff adduces evidence that after she filed her EEO complaint, (1) Dietrich began an investigation of her; (2) she was placed on details unrelated to her job advancement until she resigned in March 2005; and (3) management's plan "was to move one of the Opligers out of fire or off the Forest." (Opp'n 24

1   citing Zimmerman Aff., attached as Ex. 5 to Zimmerman
2   Dep. at page marked Bates Stamp 110.)   Taken together,
3   these tend to show a pattern of discriminatory treatment
4   over time.   See Bergene, 272 F.3d at 1144; Wallace, 479
5   F.3d at 626.

6

7       Defendant asserts courts have dismissed complaints
8   where plaintiffs were subject to more severe treatment.
9   (Reply 9.)   The Ninth Circuit authority on which it
10  rests, Kortan v. California Youth Authority, 217 F.3d
11  1104 (9th Cir. 2000), is a case in which the plaintiff's
12  primary claim was for a hostile work environment, a claim
13  subject to the severe and pervasive standard, which
14  differs from the one applied here.   Also, in that case,
15  the Court determined Plaintiff failed to demonstrate an
16  adverse employment action.   Id. at 1113.   For the reasons
17  above, this Court has determined Plaintiff demonstrated a
18  prima facie case including an adverse employment action.
19  Accordingly, Kortan is distinguishable.

20

21      The facts here are more closely analogous to
22  Satterwhite, discussed above, in which the Ninth Circuit
23  found a man who felt himself doomed to menial, temporary
24  work, and blocked from his employer from obtaining a
25  promotion, had been constructively discharged.
26  Satterwhite, 744 F.3d at 1383 (affirming judgment entered
27  after a trial).   Plaintiff asserts she was confined to a
28

variety of dead-end positions because she engaged in EEO activity.  She raises a triable issue of fact as to whether a reasonable person in her position would have felt compelled to quit.  The Court DENIES the Motion as to Plaintiff's constructive discharge claim.

## IV. CONCLUSION

For the reasons above, the Court DENIES the Motion.

Dated: <u>March 10, 2009</u>

                                    VIRGINIA A. PHILLIPS
                         United States District Judge